ARIAD Pharmaceuticals, Inc. Securities Litigation Thank you, Chief Judge Howard, and may it please the Court, my name is John Brown, and I'm here today on behalf of the plaintiff's appellant. I would like to reserve five minutes of my time for rebuttal, if that's okay? Certainly. In dismissing the securities fraud case at the pleading stage, the District Court made at least two reversible errors, one with respect to Scienter and one with respect to both Scienter and Falsity. In regards to Scienter, the District Court misapplied the Supreme Court's case in Tell Labs by improperly discounting and failing to consider on a holistic basis plaintiff's many well-pled facts, which, when taken collectively, gave rise to a strong inference that the defendants in this case acted with, at a minimum, a reckless state of mind. But to compound that error, when the District Court reached the weighing of inferences stage of Tell Labs, it placed entirely too much weight, in fact, dispositive weight, as I read the opinion, on the unremarkable fact that the defendant here is a drug company that's regulated by the FDA. Without explanation, or without much explanation, and in a single sentence, the District Court wiped the slate clean of all of plaintiff's Scienter allegations, some of which the District Court acknowledged were strong, with the sentence that said, these, I'm sorry, with the sentence that said, these allegations are strongly undercut by the fact that Ariadne was under the supervision of the FDA while the drug approval process was going on. Courts have routinely rejected the argument that a drug company receives a heightened pleading standard or an inference of Scienter is undercut under the securities laws simply because a drug company is regulated by the FDA. Indeed, that would act almost as a preemption of the securities laws, in effect, based on the regulatory scheme which is set up to address a different set of concerns, which is what patients and doctors are told about drugs and what drugs are approved for sale. Now, that's particularly error in this case, because there is evidence in the record that the District Court did not consider, which at least suggests that the defendants provided inaccurate information to the FDA during the drug approval process. The FDA noted at the end of the class period that some of the PACE 2 data that had been submitted to them by the defendants actually characterized serious events, including stroke, and I'm quoting the FDA, having characterized as grade one or mild. That was inaccurate. Whether it was intentional or not, I don't know, but it suggests, again, in line with other this way, that placing any weight, really, on the fact that a securities defendant is also regulated by the FDA shouldn't occur, at least at the pleading stage, and certainly not to the extent that the District Court did here. Counsel, wasn't the District Court, to some extent, said that, yes, there were issues arising from the use of this drug, the cardiovascular events in particular, that the company knew that was happening, that they had gotten those reports, but the company was not in a position to know whether those cardiovascular events were linked to the use of the drug, that there could be other issues, such as the sickness of the population, generally, and so, since they were not in a position to draw that linkage themselves appropriately, they were entitled in that period before the approval was granted and the block disclosure had to be put on the drug, that they were entitled to continue to talk positively about what they were discovering and it was really only when the FDA itself decided that what was going on was so troubling that there had to be disclosure that the scenario changed, but at the time they were making those favorable statements, yes, they were aware that there were problems, and the favorable statements were, in some way, a misrepresentation of what was actually happening, but the fact that they chose not to talk about them doesn't rise to either a reckless disregard of their obligation to disclose and certainly not an intent to defraud. I think that's what the District Court was saying. What's wrong with that view? Two things are wrong with that, Your Honor, and Judge Leibovitz, and I agree, I think the District Court did say that in large extent, but the District Court also noted in its opinion that defendants' own reaction to reports of adverse reactions suggests they did think that there was a linkage, or at least quite plausibly a linkage between the drug and the serious adverse events that they were admittedly seeing, because the District Court noted that when these adverse events occurred, either the dosage of iglucic was reduced or patients were removed from the drug altogether. The FDA also noted again after the class period that serious vascular events were occurring in patients, including patients in their 20s with absolutely no preexisting risk factors for vascular conditions. So point one is the District Court assumed too many facts in the defendant's favor in making that determination. But second, I think as a fundamental point of securities laws, the District Court, if that's what it was deciding, missed the core principle that if you're unsure of something and you want to investigate it, then you may remain silent. You may wait until the end of the period to see whether there's a causal link or not and make an announcement, but you can't go out like Defendant Berger did at the annual shareholder meeting on June 19, 2012, and say affirmatively, these data provide clear evidence of a favorable safety and tolerability profile. That's misleading when you know there's data that there's at least a question whether it does. It doesn't provide a clear evidence. So I would say those are the two points, Your Honor. There's too many facts being assumed for the defendants and the statements were over the top favorable when defendants actually knew that there were serious risks that at least there could be a causal link. Leaving it, oh no, finish your argument. I have a question. Go ahead. Well, Your Honor, I was going to jump into another point that I think I passed over a little bit in the briefing, although the district court did address it, but it bears on this point, too. The insider selling here was absolutely massive. It was just massive. The defendant who just made that statement about the clear safety profile at a time that he was supposedly, according to the district court, just waiting to see whether there was a causal link between the serious adverse reactions and this drug that they were marketing. At the same time, during the class period, he sold $16 million worth of his stock. Another $1.5 million worth of his stock was sold for trust to the benefit of his son and his wife. Wait, what was the time period for the $16 million? Well, that's throughout the entire class period. Okay, but you're referring to the June 2012 time period. Right. Prior to... So how much? Well, I can tell you a partial answer. Up until July 2012, that defendant sold $4 million worth of stock, and then he sold $11 million, roughly, in the period after that. That contributes to an inference here that these statements were at least reckless, and maybe, plausibly, these defendants weren't actually acting with an innocent state of mind and just waiting to see what came out. But they strongly suspected that it was going to be bad news at the end of the day, which, for investors at least, it was. I'm sorry, just to say. Let me go back to an earlier step in your argument, and that is the, I guess, step one to the effect that the district court supplied too many facts, in effect, in their favor. Did he supply facts, or did he commit, in your view, a mistake of law in assuming that the FDA regulation gave them a leeway over time for disclosure, which, in your judgment, they do not have? Is the court's sin, in your view, supplying facts or making a mistake of law about the relationship to the FDA? I think, in some ways, a little bit of both. I'm sorry if that's not a precise answer, Justice Souter, but I believe that, in one level, the district court did just jump into the minds of the defendant and assume that it was all innocent, without considering the facts, at least, that we suggested that their actions weren't innocent. But with respect to a mistake of law, it is a mistake of law to interpret the securities laws through the prism of the separate FDA regulation and regulatory scheme, and there are many cases that hold that way. The district court itself dropped a footnote and said, well, you know, the FDA is a busy government agency, maybe they can't pay attention to everything. I guarantee you they're not looking at SEC filings, they're not attending annual shareholder meetings, and they have no power to bring a lawsuit on behalf of investors when the defendants are accused of violations of the securities laws. I don't understand. Why would you say that's a mistake of law? Why wouldn't this very general concept of an obligation to disclose material facts, why can't that be informed by the FDA process in some way? If you're involved in those regulatory proceedings and you're submitting information to the FDA, which I'll have to make a judgment on about perhaps these causal issues, what's wrong with, in terms of understanding your own obligation to wait for that process to play out to some extent, what's wrong with that? Two things. Here in the complaint, we allege that there's evidence that they provided misleading information to the FDA, so that's a mistake to rely on that, because there's no facts in the record really about what was really said to the FDA. And the second thing is, as I stated before, it's okay to remain silent if you're truly waiting to see what an outcome is, but when you go out and make affirmatively positive statements, that's a violation of the securities laws, whether you're regulated by the FDA, the FEC, the State Attorney General, or whomever is your other regulator. That shouldn't be a bum on the scale at all. It certainly shouldn't be an eraser on the blackboard, which is actually what the district courts seem to do, in my view, in one sentence, to undercut all of the CNTR allegations. What did the July 2012 report say about dosage level? The July 2012 report, I believe, Your Honor, now that wasn't revealed to investors until December 2012, but that information, I believe, showed that dosages have been reduced in 73 percent of the patients. It showed that 8 percent of the patients had serious adverse events, including arterial thrombosis. So for the 73 percent with the dosage, so the complaint alleges that that was known to the defendants, at least the individual defendants. Yes, and for several reasons. First of all, as the quote I just read to you makes clear, the defendants were out there speaking to investors about what the safety data was showing. So inherent in making a positive statement like that is the duty and obligation to investigate it and know whether what you're saying is accurate. But isn't the argument slightly different on dosage than what it is with respect to the 8 percent of serious events? Aren't they slightly different arguments? Yes, Chief Justice, they are. And our argument on dosage, and thank you for that, our argument on dosage is that we learned at the end of the class period that a 45 milligram dose was the key dosage level if this drug was ever to receive approval as a frontline drug. So we argue that when the defendants were seeing these massive dosage reductions, even though some of them were disclosed in the middle of the class period, they were continuing to mislead investors by suggesting that this drug could receive frontline approval when they knew that with this level of constant dosage reduction, it was very unlikely. They make the point in their brief that the drug is now approved for a 45 milligram dose, but it's a third or fourth line drug, it's not as profitable. But so for the time period of say the fall of 2012 up to the black box date or the disclosure date in December, you know, it seems to me that it's one thing to say we're dealing with so we can continue to go out and say that it's well tolerated. But if they know that in 73 percent of the cases, the dosage that's being tested is not well tolerated, what would allow them to say that we think it's going to be okay for frontline because the studies are showing that it's well tolerated? That's the disconnect for me. I know I'm making your argument for you, but I just want to see what you have to say about it. No, I agree with that, Your Honor. I think this is a case where at every time that these defendants came out and spoke publicly about the drug, unless the FDA forced them to say something different, they were overwhelmingly positive. And it's part of this entire misleading picture that they were painting to investors that allowed them collectively to make $28 million in stock sales, while during the course of the class period, the stock declined by 90 percent. So I mean, I can only answer that question by saying yes. But let me flip it now. So the putative class members from the pre-December 2012 time period, how do they possibly have a claim that extends beyond the publication of the black box? Because – a very good question. A potential answer to that, Your Honor, is that those – you could have been an investor who continued to hold onto the stock under the belief that what defendants were saying aggressively to the market, don't worry about the safety issues. It's because of pre-existing conditions in the patient population. We're starting this new trial. We're looking forward to this drug being approved as a frontline drug. And in the securities laws, what that December disclosure was, was a partial disclosure. So investors who hold over the partial disclosure to the end of the class period could – were continued to be misled by subsequent statements of the defendants, although I think probably some of the truth was on the market on certain aspects of December. Thank you. May it please the Court. Jack Sylvia for the Ariat Appellees, and I'm joined by my colleague Matt Leavitt, who's sitting back there. With the Court's permission, I would like to address the Appellant's 34-Act Claims. Mr. Pazduszynski would address the 33-Act Claims. I would just start just because I noted it. There was a reference to Dr. Berger's sales made in connection with the July 2012 disclosure. If you refer to paragraph 366 of the complaint, their allegations make clear that Dr. Berger did not sell any shares prior to the approval of Occlusive. To the extent that he's trying to get some traction from an incentive for Dr. Berger in the pre-approval period, stock sales don't cut it. I'll talk a little more later. I just wanted to have that noted. But more broadly, the Appellant's narrative, particularly discounting the FDA, really glosses over a point that is crucial to both the issues of scienter and materiality. And that is that the FDA granted accelerated approval to Occlusive a mere five months after Ariat filed its new drug application. It based that approval on interim results of a Phase II trial, not the typical pivotal Phase III trial that is submitted with a new drug application. That's rare. And more importantly, the FDA concluded that Occlusive was safe and efficacious. The FDA, by making that conclusion, validated all of the company's pre-approval statements, which are challenged by the Appellant's, that Occlusive had evidenced a favorable safety. Well, let me, if I might, let me just challenge a little bit what you're saying there in this sense. And I'd like to focus on a December 11, 2012 statement by your clients, which disclosed that pancreatitis was a noted adverse effect from the use of the drug. And again, this is just on the eve of the approval that, of this accelerated approval, but they disclosed that pancreatitis is a problem. They describe it as the most serious adverse effect that had been determined, and they conclude that it's really not problematic. Yet they describe that as the most serious adverse effect that's been determined, even though they are aware of the high incidence of these cardiovascular events, which they do not disclose. And in fact, there was no disclosure about those cardiovascular events until, in conjunction with the accelerated approval, a statement is put out about those events, and there is a disclosure of them. So what's arguably troubling is they're aware of the importance that the public has to be aware of adverse events. They limit that disclosure to pancreatitis, say it's not a problem, but say absolutely nothing about the cardiovascular events. Just a few days later, the FDA thinks it's so important that it insists that the black person, and that it be disclosed. So, Your Honor, what I would say with respect to pancreatitis is that the disclosure of those treatment-related adverse events are being disclosed as early as the beginning of the class period. When Your Honor refers to the disclosure made on December 11th, 2012, if you look at paragraphs 232 of the complaint, there is an allegation that there is an allegation although there was disclosure of adverse events such as pancreatitis, the appellant claims that there was no disclosure of the adverse events that the FDA was concerned with. If you actually look at the next paragraph in the complaint, paragraph 233, that cites an analyst. And what the analyst says is confirming that the company expressly disclosed arterial thrombotic events during a presentation the previous Sunday, and that Sunday, if you go back with a calendar, would have been December 9th. So there is disclosure prior to the 12th, and the company also takes the position that they've maintained all along, is that those events are related in the company's view to the patient population, not causally related. So when the company is disclosing what the most common treatment-related events are, those are events that the company believes are attributable to a CLUSIG. What happens is that, and what is not alleged in the complaint, is there is nothing that is alleged that indicates that the company ever did not believe that those events observed by FDA were related to the drug. I note that there are seven confidential witnesses cited in the complaint. Not one of them says the company either believed it, their external clinical investigators, their scientists, or that they ever thought that there was a need to have to disclose this. There's not a hint of that. But is there a basis, nonetheless, to infer an ineffective claim of recklessness? And Your Honor, I would get right to that, and I think you go right back to the FDA to start with that analysis. What the appellant concedes is the FDA did not request a meeting to discuss these arterial ischemic events until October 25, 2012. There's no record in the complaint of any meeting with the FDA to discuss the results of an NDA that was only filed on a rolling basis in July of 2012. And that's almost 11 months after the start of the CLAS period, and only seven weeks before accelerated approval was granted. And what the FDA does in the approval label, which is at the appendix starting at 302, it identifies a couple of points. One of which is that it identifies that the majority of the patients, my citation is wrong here, it's the summary, I apologize, it's A457, it's submitted by the FDA in connection with the approval. And what the FDA did not say in that is that the company's conclusion was either wrong or unreasonable. All the FDA said is that the nature of the trial did not permit the FDA to state with assurance that occlusive did not cause the adverse events at issue. So it recognized that the company has put forward evidence that the adverse events were not attributable to the drug. And what it did is it established in connection with the approval, again there, that what since we don't know enough for our approval, we will have you submit 12-month data from your head-to-head epic trial to see where we are. And basically that if the FDA couldn't draw a conclusion, therefore it would be improper to infer recklessness on the part of the company. Is that the nub of it? Your Honor, and I would cite to Matrix for that point, where Matrix has said simply that if you have an adverse event and there isn't evidence that it's related to the drug in itself, it's not enough to suffice for materiality. And I would agree with your Honor that you would get to recklessness if there was something that the FDA pointed to that said you don't have a good faith basis for your conclusion, but that as opposed to just the nature of the single arm clinical trial that you can't come in and state your position to the FDA why you believe that that drug is not. But I think your brother on the other side would say this is not a case in which there is no evidence that there is a relation to the drug. This is a case in which there is conflicting evidence, and we don't know what conclusion to draw yet, just as the FDA didn't know what conclusion to draw yet. And yet under those circumstances, it may well be inferably reckless to fail to disclose that there is this kind of an issue. If you did not have a correlation, your Honor, I would agree with you, and this is where I was going to refer to the label itself, which is Appendix 302. What it discloses is that of the patients who sustained these serious adverse events, 30 of 34 of those patients, or 90 percent of them, did in fact have one or more preexisting cardiac risk factors, myocardial infarction, coronary artery disease, angina, stroke, hypertension, diabetes. So it wasn't just the company was ignoring it. It's what they were seeing as a correlation between 90 percent of these serious adverse events and patients who were coming who had failed another TKI trial and had preexisting evidence of the type of disease that would lead to these complications. And neither the FDA during the class period and the plaintiffs having alleged anything that says that assessment was wrong. All the FDA is saying, we're not going to accept it. We're not going to reject it. We're just not going to accept it. That's why they put it in a boxed warning. If they rejected it, I would submit, Your Honor, they wouldn't have approved the drug. But counsel, we've talked about the FDA's perspective. The complaint includes allegations that in the wake of the approval in December and the black box development, and then the sharp drop in stock prices in the wake of that, that there are analysts whose business it is to make judgments about this business, who said that, in fact, the failure to disclose these untoward cardiovascular events earlier was misleading. And at least the investment community attached huge significance to this disclosure, and hence the decline in stock value. Is that perspective relevant to the issue of recklessness? If you could get into the analysts' heads and look at what they disclosed that they said was misleading. If they said the company did not disclose something that the company had determined was treatment related, or that the FDA had issued the black box warning because there had been a determination that these adverse events were treatment related, I would have here in the chronology is that the company submits its data, all of its data, nothing is hidden because, of course, the FDA couldn't focus on these adverse events to say, What is this? And if you actually look in the complaint, the meeting on the 25th isn't, You're wrong. It's, We want you to come in and talk to us about the label we're going to have and why you have made your safety disclosures the way they are. So it was inviting a dialogue, and at the end of the dialogue, FDA didn't say, You're wrong. It said, We don't know. This drug is clearly going to be beneficial. It's warranting accelerated approval. We're going to put a label on that, and I don't have all of the analysts' commentary in front, but I do not recall that they drew the distinction, and none of them ever said, We think it was misleading because you knew that this drug, or should have known, or had evidence this side effects, and you didn't disclose it. If that, in fact, were the fact pattern, I would agree with Your Honor. That's not what the record shows that the company's saying. So to the extent they were simply saying, Forget the causal determination, to the extent that they were saying that investors should at least have been told that these cardiovascular events were happening so that they could then make their own judgment about whether there's or not invested, that really is not relevant to the recklessness analysis? I would turn it around the other way, Your Honor. When you don't know what the FDA is going to say, let's say that you presented this data, presented it to the FDA, and said, We don't believe that these are treatment-related, just as if one patient gets pneumonia and passes away in the hospital, we've segregated them out, and FDA says, Okay, we agree with you, or we don't know, we'll think about it. If you had made the disclosure that we have these adverse events, you run the risk of moving the stock market the other way. You are entitled to hold to your beliefs, and I think it goes to the scienter for the recklessness. As soon as FDA flagged this issue, said, We can't make that determination on this trial, there are only three disclosures in the complaint that are challenged. Two of them don't contain a misleading statement, and the third I've already referenced was the disclosure on December 11th, and what the plaintiff's complaint makes clear is that as soon as in November, that Ariadne knew that this was an issue for FDA, their disclosures contained that information. How could they continue to say that it appears that the drug is well-tolerated when, as far as I can tell, there was no evidence to support that statement with respect to the dosage level, and some considerable evidence to be concerned about that? So your Honor, again, at the very beginning of the class period, it's alleged in the complaint the company specifically explained, it actually explained what the protocol was, which is that you start at 45 if there are adverse events, you may dose down to 30, you may dose down to 15, but then you can dose back up. What is important is not the reduction in the dosing, I would submit, once you know the regimen. What is important, which is clearly withdraw the FDA's issue, is what are the adverse events? There is no dispute that the adverse events relating to dosing were disclosed, and in fact, if you look at the label, it identifies a long list of all of the adverse events which were greater than 5%. None of them relate to any of the serious adverse events that the FDA identified in November. Why does that matter? Because the other ones were all disclosed by the company as early as December 2011. So if you were out there saying we had X number of patients who sustained pancreatitis, X number of patients who sustained this, that would be the relevant and material aspect of it, and I think the reason that you can see that, one of which is that the average dose is not as low, the median is disclosed in the label as 38 milligrams, because there is dosing up and down, patients go on and off of the dose, but the important thing is that the FDA, when it looked at is this drug safe and efficacious, said the approved dose is 45 milligrams. So the FDA itself wasn't concerned with the dosing reductions as far as setting the dose. All right. Thank you. Good afternoon, members of the court. My name is Brian Pastizansky from the Goodwin Proctor Firm. I'm going to address the 1933 Act claims. Right at the outset, one important thing has to be kept in mind. The secondary offering occurs at the end of January of 2013, January 24. It occurs after the FDA has issued the black box warning that Judge Lopez has spoken about. It comes after Judge Howard's appointing time, when the company and the FDA both disclosed that 8% of the 449 patients in this pool have already experienced some form of severe arterial thrombotic event. It also comes after the FDA and the company, in its press release conference, the FDA in its Center for Drug Evaluation and Research report, fully disclosed that at some point in time over the prior two years, 73 or 75% of the patient pool have down-dosed. They've reduced their dosage from 45 down to something lower and potentially, as Mr. Silvia just noted, back up again. Very important temporally. And I'd like to address two issues today, because I think many of the arguments that the plaintiffs made to the district court are waived on appeal. They're not pressing them. And to the extent they still do, Judge Young, I think very correctly, has shown how they really have no merit. I'd like to address two issues, though. One is the misstatement allegation that Judge Young spends most of his time in the Section 11 portion of his opinion addressing. And that is an allegation, it's really an argument, that the company should have disclosed six months of data, trial data, between the July 2012 FDA report and the secondary offering. That's one issue. And the other issue I'd like to address at the very end, with your Honor's permission, is the lack of standing. And really, fundamentally, a lack of standing, not because of anything that Twombly may have done to change the pleading burden on the plaintiffs, there's not even a conclusory allegation in this case that these plaintiffs bought their shares either in the offering or traceable to the offering, which even prior to Twombly would have been fatal, and I submit is fatal here. But if I may, let me start with the misstatement issue. Plaintiffs argue that the six months of data between July 2012 and the secondary offering on January 23rd showed an increase in the number of serious arterial events. And by not disclosing that, the company somehow violated the 1933 Act because that would have been material to investors. As Judge Young correctly pointed out, the sole foundation, to the extent I can use that word, the sole basis for that argument, is data filed with the FDA eight months after the secondary offering in August of 2013 that covers a different period. It covers a 12-month period that both covers six months or more after the secondary offering as well as a period before the secondary offering. Isn't their argument, yes, that report comes six months or so after the secondary offering, but it incorporates, it discloses information that both the company and the underwriters were already aware of, were contemporaneous with the secondary offering. Isn't that their position? Well, Your Honor, I actually think their position is far more amorphous and far more nebulous. The report discloses one thing, which is that the rate of serious events grew over the course of the 12 months from 8 percent to 11.8 percent. But right there the plaintiffs make this enormous speculative leap. They assume with no factual basis that those cases somehow increased, at least in a material way, between July and January. But there is nothing in that report and there's not a single fact pled anywhere in the entire complaint, as Judge Young correctly pointed out, that would allow the court to draw an inference as to how many, if any, additional cases occurred in that six months. And I would submit, Your Honor, that absent any sort of factual foothold that would allow that inference, there is no potential violation of Section 11 here, none at all. Judge Young said that it would be pure speculation to infer that the number of additional cases of people incurring these severe events would be pure speculation to assume that they had increased on some sort of regular or linear basis during this one-year period. It's as possible that they occurred at the tail end of the year period, right before the report was filed, or in the second half, as it is anything else. And there is no basis in the complaint that would permit the court to draw any inference that a material number or a large number or anything else occurred in this important six-month period leading up to the offering. And therefore, there is no basis under the 1933 Act for a disclosure claim. And I would submit, Your Honor, that the plaintiff's allegations about the heterogeneity of the patient population, which Mr. Brown said the entire complaint has to be read holistically, but when those allegations about the patient pool are taken into account, I would submit it's impossible to draw any inference of any sort of regular or linear progression in the number of these cases. For example, the plaintiff's alleged that some of the patients are in their 20s. Others are in their 50s or 60s. Some patients have very severe health issues in addition to the leukemia, but perhaps most important is an issue that was just talked about by both Mr. Brown and Mr. Sylvia, and that is the down-dosing and the increase in some patients after down-dosing. You have a population of 449 patients, some of whom we know that as of July 2012, 75% of them had down-dosed. But what you don't know is during the six-month period, what was the dosage level for any single patient? That is not a fact that is alleged anywhere in the complaint, and I would submit the interrelationship, or to use Judge Young's phrase, the multivariate nature of this heterogeneous patient pool, the dosage level per patient, their age, their healthiness, what drugs they've taken before, result in an amalgam of variables that make it impossible to predict how many new cases occurred during that six-month period. And what's important here is that not just any increase would have triggered a duty to disclose under the securities laws. This Court said in the Cooperman case that material information, just because it's material, doesn't need to be disclosed. This Court said in Shaw v. Digital Equipment that in a case like this where we've got only interim information in a trial that was ongoing for many years, there is no duty to disclose a projection or a prediction, which I submit is all the company would have had here, unless there's an extreme departure from prior expectations. But no facts are alleged that would permit the Court to infer any such extreme departure. And Item 303, Judge Young, I think, very aptly dealt with. Namely, that is a requirement to disclose hard data that shows that there were facts that should have led an issuer reasonably to expect some material adverse effect on earnings or sales in the future. Here, you've got the FDA that essentially controls the ability of this drug to be marketed and sold, but there are no facts to suggest that during this six-month period leading up to the offering, the rate of cases increased at such a large, such a significantly large level, that the FDA's continued approval of the sale and marketing of the drug was somehow endangered. These facts are nowhere in the complaint, and therefore, under Twombly, the complaint fails, and therefore, there's no basis for a 33-Act violation. With Your Honor's permission, may I have one minute to address the standing point? Yes. Very, very simply. Prior to this Court's, or prior actually to Justice Souter's opinion in the Twombly case, the law in this circuit and everywhere else in the country was that in order for a 33-Act plaintiff to have standing, at a bare minimum, there would have to be an allegation that the shares at issue were bought pursuant to or traceable to the offering, either in the offering from the underwriters or if bought in the secondary market, could be traced back to the offering being challenged. There is no such allegation in this complaint anywhere. The plaintiffs concede they bought on the open market, but they do not allege, even conclusively, that their shares can be traced back to the offering they're challenging. The only allegation is that unnamed members of the class did, but that's not enough. Standing has to be in these plaintiffs. And I would submit to you that without... Don't they say something broader than that, that the named plaintiffs bought before and or directly from the offering and or traceable? Don't they make a statement? Not as to themselves, Your Honor. That's a reference to the class? That's a reference to their phrases, members of the class. But no doubt somebody bought this offering, but if these plaintiffs' shares did not come from the offering, they do not have statutory standing. Is that... Yes, Your Honor. You state that, perhaps correctly, as the law. I thought there was at least some debate about the proposition that even if the lead plaintiffs do not make the requisite traceable allegation, if they make such an allegation with respect to the class that they hope to represent, that that is enough to survive. But that's just... That's not my understanding of the law, Your Honor. I think we cite various cases, including the First Circuit's decision in Nomura, that make clear that for statutory standing, at a bare minimum, the shares that you as the named plaintiff bought have to at least be alleged to be traceable back to the challenged offering, and we don't even have that here. So you do not even, as the panel, does not even need to reach an argument that Judge Young discussed, which is did Twombly somehow change the pleading burden? The Court never has to get there, because even under pre-Twombly law, these plaintiffs haven't alleged the bare minimum to get across the line, and for that reason alone, as an alternative basis, Judge Young's decision, very thoughtful decision, should be affirmed. Thank you, members of the Court. Thank you, Your Honors. I would just, if it's okay, like to respond briefly on a couple of points. First of all, with respect to the amalgam of events and the confusion over the patient population, those all sound like fact issues to me. And when a party is going out and not saying to the investors, there's an amalgam of events, and we don't know what's going on, what they're saying is these data support clear evidence of a tolerable safety profile for this drug that's false and misleading under the securities laws. Again, we hear time and time again, you can't sue us, we're regulated by the FDA. The FDA eventually approved this drug at the fourth line level. The FDA didn't tell us that this data that we've had for a long time was dangerous, so how could we know? Again, the FDA didn't pass upon Defendant Berger's June 2012 statement, for instance, to investors, because the FDA wasn't there. That's not their charge under the regime. The mere fact that a company is regulated by the FDA cannot bear the weight ascribed to it at every turn by defendants, and unfortunately, in one dispositive sentence by the district court. And I would direct your honors to the in re Pfizer securities litigation in the Southern District of New York, which spells out quite clearly, the FDA is not the arbiter of securities laws. That case cites a whole host of other cases that have held the same way. Third, I would just like to say that on the standing point, your honor, there is law, Judge Laipez, that says when a plaintiff is bringing a claim that represents the same set of concerns that are implicated in another claim in a class action, that that plaintiff does have standing to bring those other claims. I think the Second Circuit in the NCEW case in 2012 said it quite clearly. I think the Nomura case might have been your case, Chief Judge Howard, and I thought that you reserved that issue a little bit. You said that you were going to decide it for purposes of that case, but you didn't have to quite determine when and in all, in which, in every instance, what it takes to have standing. So Judge Young cites to a number of pre-Bell Atlantic District Court decisions, and would you concede that none of those decisions say that it's sufficient to allege that members of the class bought at a certain time or bought stock that's traceable, but none of those cases actually hold that, do they? Well, I think Judge Young found that we do have standing, and that those cases, unless I'm mistaken, in those cases held that what we had alleged was sufficient to allege standing. He certainly said that. And I know, Your Honor, that there's actually a plaintiff, Joseph Bradley, in this case, who purchased shares in Ariad stock on the day of the offering. The price was slightly different than the offering price, but it was a $20,000 block of shares that were purchased at an average price. So it's simply plausible that that plaintiff or others can trace their shares when we get into discovery. The price was lower than the offering price, which might suggest that he purchased them ahead of time. It might. And who's in the best position to know the answer to that question, to know whether he's a proper plaintiff or not? That would clearly be the plaintiff, Your Honor, but when we, the time that we pled the case, and that $20,000 block of shares at the 1957 price or whatever that you're talking about, lower than the offering price, that's actually an average of all the purchases he made that day. At the time that we pled the complaint, we didn't read the law as requiring us to make these allegations that really are coming out of the Ninth Circus. I don't want to sound naive, but is it the case that you could only purchase from the secondary offering on that day? Weren't there lots of, like, by a factor of many millions of shares that were already out on the open market? You're correct. Okay. There could be open market or offering purchases that day. But back to the Second Circuit's analysis of this issue. Here we have the exact same misrepresentations at issue. The plaintiffs who have standing to allege the Exchange Act claims have every incentive to go out, and at least against ARIA defendants, prove up those claims. And they have the same set of concerns and represent the same interests as the plaintiffs who have the Section 11 claim. And just one final point on when it was likely or plausible that these defendants became aware of the serious, the really serious adverse events that the FDA eventually called them out on. The FDA said that fatal and serious adverse events have occurred as early as two weeks after starting iClusive. And the PACE 2 trial closed two and a half months before the start of our class period. It's perfectly plausible. Indeed, it's highly likely that they were observing these events right from the beginning of the class period. Thank you all.